ELLEN F. ROSENBLUM
Attorney General
SHAUNEE MORGAN No.194256
Senior Assistant Attorney General
CARLA A. SCOTT No.054725
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Sarah.Weston@doj.state.or.us
        Carla.A.Scott@doj.state.or.us

Of Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services,<br><br>Defendant. | Case No.  6:19-cv-01996-AA<br><br>DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     SUMMARY JUDGMENT STANDARD ...................................................... 3

III.    LEGAL STANDARD FOR FACIAL CHALLENGES .................................... 3

IV.     OVERVIEW OF H.B. 4005 .......................................................................... 4

        A.      Information that drug manufacturers must provide to DCBS............................. 4

        B.      Information that DCBS must, in turn, publicly disclose....................................... 7

        C.      Overview of how DCBS has implemented H.B. 4005 to date............................. 7

V.      ARGUMENT................................................................................................ 9

        A.      PhRMA lacks Article III standing for any of its claims. ....................................... 9

        B.      The preemption claim fails because H.B. 4005 does not conflict with the
                DTSA and PhRMA has not met its burden for a facial challenge. ...................... 10

                1.      It is not impossible to comply with both H.B. 4005 and the DTSA. ........ 11

                2.      H.B. 4005 does not frustrate any congressional purpose......................... 12

                3.      The preemption claim also fails because PhRMA has not
                        established that in *all possible applications* H.B. 4005 conflicts
                        with or stands as an obstacle to the DTSA ............................................. 15

        B.      PhRMA has not met its burden for a facial takings claim. ................................. 15

        C.      PhRMA's First Amendment claim should be rejected because H.B. 4005
                requires only commercial speech and passes the *Zauderer* test. .......................... 19

                1.      H.B. 4005 calls for commercial, not private, speech. .............................. 19

                2.      H.B. survives constitutional review under the three-pronged
                        *Zauderer* test for commercial speech........................................................ 23

                        a.      H.B. 4005 is rationally related to a substantial state interest........ 23

                        b.      H.B. 4005 requires disclosure only of factual and....................... 25

                        c.      H.B. 4005 is not unduly burdensome.......................................... 27

        D.      PhRMA's dormant Commerce Clause challenge fails as a matter of law
                because H.B. 4005 does not regulate any interstate commerce........................... 27

                1.      The scope of the Dormant Commerce Clause is narrow. ......................... 28

2.      H.B. 4005 does not regulate or discriminate against any interstate commerce. ................................................................................................. 30

3.      The market participant doctrine exempts H.B. 4005 TA \s "H.B. 4005" from the Dormant Commerce Clause**.**........................................... 32

VI.    CONCLUSION................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) ............................................................. 10

*Am. Beverage Ass'n v. City & Cty. of S.F.*, 916 F.3d 749 (9th Cir. 2019) ...................... 22, 23, 27

*Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*, 903 F.3d 903 (9th Cir. 2018).................................... 23

*Ass'n des Eleveurs de Canards*, 729 F.3d 937 (9th Cir. 2013).................................................. 30, 31

*Ass'n. of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726 (9th Cir. 1994).................................. 21

*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935) ................................................................. 29, 30

*Bolger v. Youngs Drug Products Corporation* 463 U.S. 60 (1983) ........................................ 20, 21

*Brown-Forman Distillers Corp. v. N. Y. State Liquor Auth.*, 476 U.S. 573 (1986).......... 28, 29, 30

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557 (1980) ......... 20, 21

*Chemical Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958 F.2d 941 (9th Cir. 1992)........................ 10

*CTIA- The Wireless Assoc. v. City of Berkeley, California*, 928 F.3d 832 (9th Cir. 2019)
    ......................................................................................................... ....22, 23, 25, 26, 27

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ............................................................. 29

*Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169 (10th Cir. 2015) ......................................... 30

*Eng. Mfrs. Ass'n v. S. Coast Air Quality Mgt. Dist.*, 498 F.3d 1031 (9th Cir. 2017) ................... 32

*Envtl. Defense Ctr., Inc., v. U.S. E.P.A.*, 344 F.3d 832 (9th Cir. 2003)....................................... 25

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978) ............................................... 31, 32

*Fast Enterprises, LLC v. Pollack*, 2018 WL 4539685 (D. Mass. Sept. 21, 2018)........................ 14

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995).................................................................... 11

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................. 9

*Frudden v. Pilling*, 742 F.3d 1199, 1204 (9th Cir. 2014) ........................................................ 22

*Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989).............................................................. 29, 30, 31

*Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979) ....................................................................... 12

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981) ...................... 19

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S.333 (1977). .................................... 9, 10, 20

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987).................................... 19

*Levald, Inc. v. City of Palm Desert*, 998 F.2d 680 (9th Cir. 1993)...............................................19

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992)......................................................16

*Maryland v. Louisiana*, 451 U.S. 725 (1981). ..............................................................11

*Masonry Building Owners of Oregon v. Wheeler*, 394 F.Supp. 3d 1279 (D. Or. 2019) ........ 20, 21

*Nat'l Ass'n of Mfrs v. SEC*, 800 F. 3d 518 (D.C. Cir. 2015)) ........................................24

*Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144 (9th Cir. 2012) ....................30

*Nat'l Institute of Family & Life Advocates v. Becerra* (NIFLA),─── U.S. ───, 138 S.Ct. 2361 (2018)...................................................................................................... 23, 26

*National Collegiate Athletic Ass'n v. Miller (NCAA)*, 10 F.3d 633 (9th Cir. 1993) .............. 31, 32

*New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973) .......................................14

*Pharma Research & Mfrs. of Am. v. Cty. of Alameda*, 768 F.3d 1037 (9th Cir. 2014)...............28

*Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005) ......... 16, 17, 20, 21, 24

*Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644, 653-654, 655-656 (2003) ......................................................................... 30, 31

*Philip Morris, Inc. v. Reilly*, 312 F.3d 24 (1st Cir 2002).................................................16

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .....................................................28, 29

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013).................................30

*Rodriguez v. City of San Jose*, 930 F.3d (9th Cir. 2019) ...............................................9

*Ruckelshaus v. Monsanto*, 467 U.S. 986 (1984) .....................................................16, 17

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47 (2006).......................................21

*Safeway Stores v. State Bd. of Agriculture*, 198 Or. 43,92 (1953)...................................................4

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d (9th Cir. 2000).......................................9

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) .....................................................10

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)...............................3

*Willis v. City of Seattle*, 943 F.3d 882 (9th Cir. 2019).............................................................3

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985)......................................................................... 19, 22, 23, 25, 27

**Statutes**

18 U.S.C. § 1838 ................................................................................................................. 13

Defense of Trade Secrets Act of 2016, PL 114-153, May 11, 2016 , 130 Stat 376 ........ …. 2,10-15

House Bill 2658, 2019 Or. L. Ch. 436 ................................................................................. 1

ORS 192.345 ....................................................................................................................... 7

ORS 646.463 ...................................................................................................................... 11

ORS 646A.680 – 646A.692 (H.B. 4005) ................................................................... *Passim*

18 U.S.C. § 1833 ............................................................................................................... 14

18 U.S.C. § 1836 ............................................................................................................... 11

18 U.S.C. § 1839(5) .......................................................................................................... 12

Uniform Trade Secrets Act (UTSA) ................................................................................. 11

**Rules and Regulations**

Fed. R. Civ. P. 56. .............................................................................................................. 3

OAR 836-200-0540 & 836-200-0545 ............................................................................... 12

OAR 836-200-0540(3), (4) ................................................................................................. 7

## CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7-1, the parties made a good faith effort through telephone conferences to resolve the disputes that are the subject of this motion and have been unable to do so.

## MOTION

Pursuant to Fed. R. Civ. P. 56, Defendant moves for partial summary judgment. Defendant is entitled to judgment as a matter of law against the claims in the complaint to the extent they challenge House Bill 4005, 2018 Or. L. Ch. 7, codified in ORS 646A.680 – 646A.692 (H.B. 4005).[1]  Those claims lack of subject matter jurisdiction and fail  to establish any claim for relief.  This motion is supported by the following memorandum of law and the Declaration of Cassandra Soucy (Soucy Decl.) and the Declaration of Shaunee Morgan (Morgan Decl.).

## I.    INTRODUCTION

In 2018, the Oregon legislature enacted a law providing for drug-pricing transparency. House Bill 4005, 2018 Or. L. Ch. 7, codified at codified in ORS 646A.680 – 646A.692 (H.B. 4005).  H.B. 4005 requires pharmaceutical manufacturers to report on specific new prescription drugs and certain historical information in annual reports relating to pricing for existing drugs to the Oregon Department of Consumer and Business Services (DCBS).  DCBS is, in turn, required to post that information on its website *unless* (1) the information is a trade secret and (2) the public interest does not require disclosure.  Pharmaceutical industry pricing is often notoriously opaque, and the Oregon Legislature concluded that by increasing price transparency, the state could enhance information available in the market and provide accountability in the market

---

[1] The complaint's four claims also challenge House Bill 2658, 2019 Or. L. Ch. 436.  But those claims have been stayed at the parties' request.  This motion addresses the alleged claims for relief only to the extent they challenge H.B. 4005.

provide more accountability in the market, which in turn could be expected to benefit Oregon agencies and Oregon consumers who purchase prescription drugs.

Plaintiff Pharmaceutical Research and Manufacturers of America (PhRMA) contends that because this law *risks* disclosure of its members' trade secrets in *some* potential circumstances, it is unconstitutional and void on its face. PhRMA asserts four legal theories to this end: (1) uncompensated takings; (2) preemption pursuant to the Supremacy Clause by the federal Defense of Trade Secrets Act (DTSA); (3) violation of the Commerce Clause; and (4) violation of the First Amendment by compelling speech. For each of these claims, PhRMA seeks declaratory and injunctive relief invalidating H.B. 4005 *in toto*.

For the reasons set forth in more detail below, PhRMA's claims should all be dismissed with prejudice on summary judgment. First and foremost, PhRMA has not satisfied and cannot satisfy the requirements for its facial challenge. To prevail, PhRMA would have to show that H.B. 4005 is unlawful in all possible applications (or a substantial number of applications, for the First Amendment claim). PhRMA's claims also fail on their merits. H.B. 4005 is not in conflict with (and thus not preempted by) the DTSA because (1) the DTSA expressly carves out lawful state programs from its scope; (2) the DTSA only provides a cause of action to redress misappropriation of trade secrets and compliance with H.B. 4005 will not result in any misappropriation; and (3) even if H.B. 4005 might result in misappropriation in some instances (and it will not), nothing in it would prevent a PhRMA member from filing an action under the DTSA to prevent such misappropriation. The facial Takings claim also fails because no takings have occurred. If any takings ever do occur, they will necessarily be for a public purpose and a drug manufacturer's remedy would be to seek relief for just compensation. The First Amendment challenge fails because the required disclosures are commercial speech rationally related to the State's interests. Finally, the Commerce Clause claim fails because H.B. 4005 does not regulate or discriminate against any interstate commerce and PhRMA does not argue that it otherwise violates the Commerce Clause.

## II.    SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.

## III.    LEGAL STANDARD FOR FACIAL CHALLENGES

This case is a facial challenge.  "A facial challenge is an attack on a law itself as opposed to a particular application. Such challenges are considered the most difficult to mount successfully. A facial challenge is a claim that a law or policy is unconstitutional *in all of its applications*."  *Willis v. City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019) (internal citations and quotation marks omitted) (emphasis added).  Thus, generally, in order to succeed on a facial challenge, PhRMA must establish that "no set of circumstances exists under which the [challenged act] would be valid."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  "The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid."  *S.D. Myers, Inc. v. City & Cnty. of S.F.*, 253 F.3d 461, 467 (9th Cir. 2001).

With respect to facial challenges based on the First Amendment, however, a somewhat different standard applies.  *Wash. State Republican Party*. at 450, n. 6.  Namely, PhRMA must show, at a minimum, that "a substantial number of [the challenged law's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Id*. (citations and internal quotes omitted, discussing application of the overbreadth doctrine).

In short, because PhRMA brings only a facial challenge rather than waiting for case-by-case adjudication in the ordinary course, it faces a heavy burden in this case.  In particular, in order to prevail on its preemption, dormant Commerce Clause, and Takings claims for relief, PhRMA must establish that there is **no possible way** H.B. 4005 could be applied constitutionally. To prevail on their First Amendment claim, PhRMA must establish that a substantial number of the law's applications are unconstitutional, viewed in relation to its plainly legitimate sweep.

Page 3 -    DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
SW2/sm5/10252104-v2

## IV.     OVERVIEW OF H.B. 4005

In March of 2018, Oregon enacted the Prescription Drug Price Transparency Act in House Bill 4005, 2018 Or. L. Ch. 7 (H.B. 4005).[2]  In the preamble to this law, the Oregon Legislature provided the following reasons for its enactment:

> Whereas the state has a substantial public interest in the price and cost of prescription drugs;
>
> Whereas the state is a major purchaser of prescription drugs through the Public Employees' Benefit Board, the Oregon Health Authority, the Department of Human Services and the Department of Corrections;
>
> Whereas the state also provides major tax expenditures for health care through the tax exclusion of employer-sponsored health insurance coverage and the deductibility of the excess medical costs of individuals and families;
>
> Whereas the Legislative Assembly intends . . . to provide notice and disclosure of information relating to the cost and pricing of prescription drugs in order to provide accountability for prescription drug pricing;
>
> and Whereas the Legislative Assembly intends by this 2018 Act to permit a manufacturer of a prescription drug to voluntarily make pricing decisions regarding a prescription drug, including decisions that result in price increases; and
>
> Whereas the Legislative Assembly intends by this 2018 Act to permit purchasers, both public and private, as well as pharmacy benefit managers, to negotiate discounts and rebates for prescription drugs consistent with existing state and federal law. . . .

H.B. 4005, preamble.  While informative, this preamble does not and cannot expand the terms in the Act; H.B. 4005's scope is determined by its terms which follow the preamble.[3]

### A.     Information that drug manufacturers must provide to DCBS.

For drugs whose wholesale acquisition prices (WAC), as defined in 42 U.S.C. 1395w-3a(c)(6)(B), were increased by a certain threshold,[4] the H.B. 4005 requires manufacturers to

---

[2] The complaint does not challenge the administrative rules promulgated pursuant to the H.B. 4005.

[3] "A preamble to a statute is an introductory or prefatory clause, following the title and preceding the enacting clause, explanatory of the reasons for its enactment and the objects sought to be accomplished. It is usually introduced by the word 'whereas,' meaning 'considering that' or 'that being the case.' It is not an essential or effective part of an act, the purview of which consists of all parts thereof after the preamble. The preamble cannot enlarge or confer powers . . . ." *Safeway Stores v. State Bd. of Agriculture*, 198 Or. 43,92 (1953).

provide various categories of information in an annual report to DCBS starting July 1, 2019.

H.B. 4005 secs. 2(3)(l), 7(a).  The required information is as follows:

(a) The name and price of the prescription drug and the net increase, expressed as a percentage, in the price of the drug over the course of the previous calendar year;

(b) The length of time the prescription drug has been on the market;

(c) The factors that contributed to the price increase;

(d) The name of any generic version of the prescription drug available on the market;

(e) The research and development costs associated with the prescription drug that were paid using public funds;

(f) The direct costs incurred by the manufacturer:

(A) To manufacture the prescription drug;
(B) To market the prescription drug;
(C) To distribute the prescription drug; and
(D) For ongoing safety and effectiveness research associated with the prescription drug;

(g) The total sales revenue for the prescription drug during the previous calendar year;

(h) The manufacturer's profit attributable to the prescription drug during the previous calendar year;

(i) The introductory price of the prescription drug when it was approved for marketing by the United States Food and Drug Administration and the net yearly increase, by calendar year, in the price of the prescription drug during the previous five years;

(j) The 10 highest prices paid for the prescription drug during the previous calendar year in any country other than the United States;

(k) Any other information that the manufacturer deems relevant to the price increase . . . .; and

---

[4] Reporting under H.B. 4005 is required for "each prescription drug for which:

(a) The [WAC] was $100 or more for a one-month supply or for a course of treatment lasting less than one month; and

(b) There was a net increase of 10 percent or more in the [WAC] of the prescription drug described in paragraph (a) of this subsection over the course of the previous calendar year." H.B. 4005 sec. 2(2)(a)-(b).

(L [sic]) The documentation necessary to support the information reported under this subsection.

*Id*. sec 2(3).

In addition, drug manufacturers must also provide the following information about each patient assistance program offered by the manufacturer to Oregon consumers:

(a) The number of consumers who participated in the program;

(b) The total value of the coupons, discounts, copayment assistance or other reduction in costs provided to consumers in this state who participated in the program;

(c) For each drug, the number of refills that qualify for the program, if applicable;

(d) If the program expires after a specified period of time, the period of time that the program is available to each consumer; and

(e) The eligibility criteria for the program and how eligibility is verified for accuracy.

*Id*. sec. 2(5)(a)-(e).

Additionally, 30 days or less after a manufacturer introduces a *new* prescription drug for sale in the United States at a price that exceeds the threshold established by the Centers for Medicare and Medicaid Services for specialty drugs in the Medicare Part D program, H.B. 4005 requires manufacturers to provide various categories of information to DCBS starting March 15, 2019.  The required information for such new drugs is as follows:

(a) A description of the marketing used in the introduction of the new prescription drug;

(b) The methodology used to establish the price of the new prescription drug;

(c) Whether the United States Food and Drug Administration granted the new prescription drug a breakthrough therapy designation or a priority review;

(d) If the new prescription drug was not developed by the manufacturer, the date of and the price paid for acquisition of the new prescription drug by the manufacturer;

(e) The manufacturer's estimate of the average number of patients who will be prescribed the new prescription drug each month; and

(f) The research and development costs associated with the new prescription drug that were paid using public funds.

Page 6 -    DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO
    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
    SW2/sm5/10252104-v2

*Id.* sec. 2 (6)(a)-(f).

**B.      Information that DCBS must, in turn, publicly disclose.**

H.B. 4005 requires DCBS to post the information it receives from drug manufacturers on its public website. *Id.* sec. 2(9). However, DCBS "may not post" if (1) the "information is conditionally exempt from disclosure under ORS 192.345 [a section of Oregon's Public Records Law] as a trade secret"; and (2) "[t]he public interest does not require disclosure of the information." *Id.* sec. 2(10).

Where a manufacturer claims that any data element in a report is trade secret, DCBS employs a robust process to review such claims before deciding whether that data element should be disclosed. Oregon Administrative Rules set forth the details of that process for a drug manufacturer to seek to prevent its purported trade secrets from being disclosed. DCBS rules provide that a 15-day notice must be given to manufacturers before information claimed as trade secret may be disclosed. During that timeframe a manufacturer may appeal a decision to disclose to the Director of DCBS. Following this internal appeal, if the Director determines that the information must be disclosed, a manufacturer must be given 21 days' notice before any information claimed a trade secret may be disclosed. This notice provides manufacturers with the opportunity to appeal DCBS's decision to Oregon courts before any information believed to be a trade secret is made available publicly. *See* OAR 836-200-0540(3), (4).

If DCBS decides not to post information online, a person may petition the Attorney General for review under a public law provision that allows for eventual review by the courts. H.B. 4005, sec. 2(10)(c).

**C.      Overview of how DCBS has implemented H.B. 4005 to date.**

To date, 1,112 reports have been filed under H.B. 4005. Soucy Decl. ¶ 4. DCBS has posted, via its website, data elements from those reports that were not claimed as trade secret. See https://dfr.oregon.gov/drugtransparency/data/Pages/index.aspx. *Id.* ¶ 5. To date, DCBS has not disclosed any information a drug manufacturer has claimed as a trade secret. Manufacturers have asserted 4,865 trade secret claims in reports submitted to DCBS. *Id.*

Review of these claims is ongoing as reports are made and DCBS is beginning to make initial determinations on trade secret claims.  *Id.* ¶ 6.

The trade secret determination process provides an opportunity for the manufacturer to appeal DCBS' determination before a final determination is made.  Manufacturers are also provided 21-days' notice before any information claimed to be trade secret is publicly posted. *Id.*

In conducting its review of information claimed as trade secrets, DCBS has observed that much of the information claimed as trade secret by the manufacturers has in fact been published by those manufacturers elsewhere in press releases, U.S. Securities and Exchange Commission (SEC) filings, or otherwise, and are therefore not trade secrets.  *Id.* ¶ 7.  For example, one manufacturer submitted lengthy narrative descriptions for its marketing and pricing methodology of a new drug report and claimed that this information was trade secrets.  *Id.* ¶ 8.  DCBS staff subsequently found all the information on publicly available websites such as the manufacturer's own website, press releases from the manufacturer, SEC 10K filings, and clinical trial information submitted to the FDA.  *Id.* ¶ 8.

Another manufacturer claimed the price of the drug in other countries was a trade secret. DCBS requested additional information asking for more information on why this was a trade secret when most companies did not claim prices in other countries as a trade secret. *Id.* ¶ 9.  The manufacturer then withdrew its trade secret claim.  Similarly, one manufacturer claimed its entire filing as a trade secret. DCBS communicated with the manufacturer that the trade name, generic name, and wholesale acquisition cost of the drug reported were not trade secrets since this information was available on the manufacturer's website. The manufacturer agreed that this information was not a trade secret.  *Id.* ¶ 10.  Further, some manufacturers have rescinded their trade secret claims after seeing that similar information submitted by other manufacturers had been publicly displayed on DCBS' website.  *Id.* ¶ 11.

If DCBS determines that particular information is rightly claimed as a trade secret, DCBS will not publicize that information unless the public interest requires it.  This will be decided on a case-by-case basis.  *Id.* ¶ 12.  It is possible that none of the information a PhRMA member has

submitted to DCBS contains trade secrets. *Id. It* is also possible that, even if a PhRMA member has provided trade secrets to DCBS, disclosure to the public may not be required by the public interest. *Id.* And, as stated above, before disclosure occurs a drug manufacturer has ample opportunity to prevent it via judicial review.

It is possible that none of the information a PhRMA member has submitted to DCBS contains trade secrets. It is also possible that, even if a PhRMA member has provided trade secrets to DCBS, disclosure to the public may *not* be required by the public interest.

## V.     ARGUMENT

### A.     PhRMA lacks Article III standing for any of its claims.

As a threshold matter, PhRMA has not established facts sufficient to establish standing on any of its claims, either directly or on behalf of its members. Article III standing requires a plaintiff to show that it "has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). While the risk of future injury may satisfy this standard, a plaintiff must prove that such a risk is "realistic" and not "too imaginary or speculative." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1149 (9th Cir. 2000) (en banc) (internal citations omitted).

An association can establish standing to bring a complaint on its own behalf if it has suffered an injury in fact, namely "frustration of its organizational mission [and] diversion of its resources to combat the particular [injurious behavior] in question." *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (internal citation omitted).

An association may also have standing in its representational capacity when it establishes that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members…" *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Here, PhRMA seeks federal court relief on behalf of itself and its members. Compl. ¶ 1. Besides noting that it serves as a public policy advocate for its members, Plaintiff makes no allegation of how the enactment of the H.B. 4005 has frustrated its organizational mission or resulted in a diversion of its organizational resources. *Cf. Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (organization established direct standing by proving chilling effect that immigration law in question had on its ability to transport undocumented immigrants and that organizational resources had been diverted to educating immigrant communities about said law).

PhRMA also fails to satisfy the first element of the *Hunt* test for representational standing, namely that any of its members have suffered an injury in fact to bring a claim in their own right. By PhRMA's own acknowledgment, H.B. 4005 does not call for the *automatic* disclosure of reports filed by manufacturers, Compl. ¶¶ 37-38, and PhRMA has not alleged that any of its members have been notified of DCBS's intention to disclose any information they have claimed as trade secrets. The alleged "risk that DCBS will publicly disclose the confidential information [PhRMA members] have provided and will provide," Compl. ¶ 92, is speculative and PhRMA has not submitted the requisite evidence on summary judgment that would support standing. Moreover, as discussed throughout this brief, PhRMA members will have ample due process to stop any public disclosure before it happens. Summary judgment in DCBS's favor on PhRMA's facial claims should, therefore, be granted on this basis alone.

**B.**     **The preemption claim fails because H.B. 4005 does not conflict with the DTSA and PhRMA has not met its burden for a facial challenge.**

Whether a federal law preempts state law is fundamentally a question of congressional intent and is disfavored *absent clear intent to preempt. Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). There is a strong presumption against preemption. *Chemical Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958 F.2d 941, 943 (9th Cir. 1992). There are various species of preemption,[5] but

---

[5] There are "four species" of federal preemption: (1) express preemption; (2) conflict preemption; (3) obstacle preemption; and (4) field preemption. *English v. General Elec. Co.*

Page 10 -   DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
SW2/sm5/10252104-v2

PhRMA bases its facial preemption claim only on a conflict preemption theory. *See* ECF No. 25 at 32-38.

To establish its facial conflict preemption challenge to H.B. 4005, PhRMA must prove that in all possible applications either that (1) it is impossible to comply with both H.B. 4005 and the DTSA or (2) H.B. 4005 is an obstacle to accomplishment and execution of the full purposes and objectives of Congress in enacting the DTSA. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 286 (1995) (internal quotes omitted); *Maryland v. Louisiana*, 451 U.S. 725, 747 (1981). PhRMA has not met this burden because it is entirely possible to comply with both H.B. 4005 and the DTSA. These laws can be construed congruently under a straightforward statutory interpretation analysis. H.B. 4005 also does not stand in all possible applications as an obstacle to accomplishment of congressional purpose for the DTSA, as confirmed by text and legislative history of the DTSA.

The preemption claim fails as a matter of law and summary judgment should be granted for DCBS.

### 1.    It is not impossible to comply with both H.B. 4005 and the DTSA.

The DTSA, which mirrors Oregon's adoption of the Uniform Trade Secrets Act (UTSA),[6] provides a federal private right of action to protect trade secrets from "misappropriation":

> An owner of a trade secret *that is misappropriated* may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

18 U.S.C. § 1836 (emphasis added). The DTSA provides specifically for a private cause of action in federal court for an injunction to prevent misappropriation of or to seek damages in appropriate instances. *Id.* 1836(b). "Misappropriation" is defined as:

---

496 U.S. 72, 78-79 (1990). Express preemption applies where Congress has expressly stated its intent to supersede state law. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95-98 (1983).

[6] *See* ORS 646.463.

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that--

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5).

Compliance with H.B. 4005 will not violate the DTSA, because it will not result in any misappropriation under the text of the DTSA. In the speculative event that DCBS posts a PhRMA member's trade secrets online, it would not constitute misappropriation because it would only occur *after* the drug manufacturer was afforded robust due process to prevent disclosure pursuant to administrative rules promulgated under H.B. 4005. *See* OAR 836-200-0540 & 836-200-0545.

### 2.    H.B. 4005 does not frustrate any congressional purpose.

With regard to whether a state law stands as an obstacle to the implementation of a federal law, the Supreme Court has stated that the "pertinent question" is whether the state law "sufficiently injure[s] the objectives of the federal program to require nonrecognition [of the state law]." *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583 (1979).

According to PhRMA, H.B. 4005 is contrary to congressional purpose underlying the DTSA, which PhRMA contends is to broadly and absolutely protect trade secrets so as to encourage innovation and competitiveness of American industry. *See* Compl. ¶¶ 9, 67 & 70. But the DTSA does not operate as PhRMA suggests.

To achieve its purposes, the DTSA does not provide for absolute protection of trade secrets, but rather merely provides for a cause of action in federal court for holders of trade secrets to prevent misappropriation or theft, and to sue for damages in appropriate cases. Nothing in H.B. 4005 would prevent such legal actions. In addition, under the rules implementing H.B. 4005 and Oregon's version of the DTSA, there are ample opportunities for a drug manufacturer to take legal action to prevent disclosure through state administrative and judicial procedures.

PhRMA relies heavily on the DTSA's provision that it is not intended to preempt or displace state law "remedies." ECF No. 25 at 36 (citing 18 U.S.C. § 1838). PhRMA argues that this provision "obviously" means, by *negative implication*, that Congress *did* intend to displace state laws that otherwise touch on trade secret issues. *See* ECF No. 25 at 26-27.

This argument fails, particularly given the presumption against preemption absent clear congressional intent, which does not exist here. First, the DTSA's anti-preemption clause was intended to be broader than PhRMA contends: "Nothing in the amendments made by this section shall be construed to modify the rule of construction under section 1838 of title 18, United States Code, or to preempt any other provision of law." Defense of Trade Secrets Act of 2016, PL 114-153, May 11, 2016 , 130 Stat 376)

Second, the DTSA does not protect holders of trade secrets from *lawful* federal, state, or local government activity and carves out such state programs from its reach:

> (a) In general. This chapter does not prohibit . . .
>
> (1) any otherwise lawful activity conducted by a governmental entity of the United States, a State, or a political subdivision of a State[.]

Page 13 -    DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
SW2/sm5/10252104-v2

18 U.S.C. § 1833. And PhRMA appears to concede that this type of anti-preemption clause is typically used by Congress to indicate that the federal law is not meant to dominate the field exclusively. ECF No. 25 at 38. The House Judiciary Committee also stated its intent not to interfere with state law generally:

> Consistent with the overall intent of the Defense Trade Secret Act and, in particular, Section (2)(f), which provides that the bill does not "preempt any other provision of law," the remedies provided in S (3)(A)(i)(1)(I) are intended to coexist with, and not to preempt, influence, or modify applicable State law governing when an injunction should issue in a trade secret misappropriation matter.

H.R. Rep. No. 114-529, 2016 U.S.C.C.A.N. 195, 207. The Committee also said: "Carefully balanced to ensure an effective and efficient remedy for trade secret owners whose intellectual property has been *stolen*, the legislation is designed to avoid disruption of legitimate businesses, without preempting State law." *Id*. at 200 (emphasis added). The Senate Judiciary Committee made similar statements, such as "state trade secret laws are not preempted or affected by this Act." S. Rep. 114-220 (2016).

Against this backdrop, at least one federal court has held that the DTSA was not intended to displace lawful state laws or programs that may result in public disclosure of trade secrets pursuant to a state program. *See Fast Enterprises, LLC v. Pollack*, 2018 WL 4539685 (D. Mass. Sept. 21, 2018) (holding that the DTSA does not permit state contractors to sue a state for disclosing trade secrets because "Congress specifically intended to circumscribe the DTSA so it would not interfere with the policy choices made by state governments in regard to their own operations").

PhRMA's attempt to infer preemption from the general subject matter of the DTSA is tantamount to saying that whenever Congress decides to step into a field, it will be exclusive. But that is not how preemption operates. *See, e.g., New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973) (rejecting contention that preemption is to be inferred merely from the comprehensive character of the federal law at issue).

In sum, H.B. 4005 does not "sufficiently injure the objectives" of the DTSA so as to require wholesale preemption of that Oregon law.  The DTSA merely provides for a federal cause of action for a holder of trade secrets to protect against their theft or misappropriation across state lines or by foreign countries.  H.B. 4005 does not prevent such causes of action from being pursued nor does it steal or misappropriate any trade secrets.  Rather, it is the type of lawful state program that Congress did not intend to disrupt via the DTSA.

> **3.    The preemption claim also fails because PhRMA has not established that in *all possible applications* H.B. 4005 conflicts with or stands as an obstacle to the DTSA.**

Finally, even if there could be some potential application of the H.B. 4005 that might conflict with or frustrate congressional purpose for the DTSA (and there is not), PhRMA still would not have met its burden for a facial challenge here.  PhRMA has not shown that application of H.B. 4005 will not result in publication of trade secrets in *all* possible applications.

To the contrary, it is possible that (1) none of the information a PhRMA member supplies to DCBS is in fact a trade secret; and (2) even if some information were a trade secret, the public-interest exception will not necessarily *always* (and might *never*) require DCBS to disclose it.  Disclosure by DCBS would *only* occur if the public interest required it, and that analysis will require a balancing of the public interest in protecting trade secrets against the public interest in disclosing them.  H.B. 4005, sec. 2(10).

PhRMA has failed to meet its high burden for its facial preemption claim—namely, that the public interest will *always* require DCBS to publicly disclose all trade secrets (if any) that PhRMA members report to DCBS pursuant to H.B. 4005.  Summary judgment should be granted in DCBS's favor on PhRMA's facial preemption claim.

> **B.    PhRMA has not met its burden for a facial takings claim.**

PhRMA alleges that H.B. 4005 effects uncompensated takings based on two theories. First, it alleges H.B. 4005 effects a categorical (per se) taking because it threatens public disclosure of manufacturers' trade secrets, thereby negating the value of those trade secrets.

Compl. ¶ 81. Second, and alternatively, PhRMA alleges that H.B. 4005 effects a "regulatory" taking. Compl. ¶ 82.

Regardless of what standard applies,[7] the takings claim should be dismissed on summary judgment because PhRMA has not met its burden of proving that H.B. 4005 will "take" trade secrets in *all* of its applications. As noted above, the reporting required by that law will not result in public disclosure of trade secrets in all possible applications. Moreover, as explained below, not every disclosure of a trade secret is a "taking." Finally, any "taking" would on its face necessarily be for a public purpose and thus permissible; in those instances, a drug manufacturer's remedy would be to seek just compensation via an as-applied claim.

Case law regarding facial takings claims confirm this fatal deficiency in PhRMA's claim here. For example, the First Circuit rejected a facial challenge to a disclosure requirement when the data required to be disclosed were trade secrets for some, but not all, of those entities required to report. *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 313 (1st Cir. 2005) ("Rowe"). *Rowe* involved a law that required pharmacy benefits managers (PBMs) to disclose to their customers "information concerning the discounts and other contract terms that they are able to negotiate with drug manufactures and pharmacies." *Id*. at 305-06. Plaintiff PCMA, a trade association representing the PBMs, asserted that that information was a "trade secret," and challenged the Unfair Prescription Drug Practices Act (UPDPA) on its face.

The court rejected the claim, explaining that the "PCMA has the burden to prove that *every* disclosure under the UPDPA, if uncompensated, would result in an unconstitutional

---

[7] This Court need not decide whether to analyze this claim under a per se or a regulatory takings theory. If the Court, however, reaches that question, PhRMA has not cited any case recognizing "per se" takings for personal property for anything other than actual physical appropriation. Instead, per-se takings claims have been limited to real property (land). *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027–28 (1992), and its progeny. The cases PhRMA cites addressing trade secret takings-by-disclosure claims were evaluated as regulatory, not per-se takings claims. For example, in *Ruckelshaus v Monsanto,* the only Supreme Court case to address takings for trade secrets, the Court applied the standard *Penn Central* analysis, rather than treating disclosure and use of the trade secrets as a per-se taking. 467 U.S. at 1004-1006. In *Philip Morris, Inc. v. Reilly*, 312 F.3d 24 (1st Cir 2002), the First Circuit expressly considered and rejected calls to apply a per-se takings analysis in a case involving compelled disclosure of tobacco companies' ingredient lists (undisputed trade secrets).

Page 16 -    DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
SW2/sm5/10252104-v2

taking." *Id*. at 307 (emphasis in original). The court could not make that finding and observed that the evidence showed that certain PBMs already routinely disclosed this information to customers, which meant the information was not a "trade secret" for at least some PBMs. Thus, the court concluded, "there are clear and obvious circumstances when disclosures under the UPDPA *are not* unconstitutional takings." *Id*. at 308 (emphasis in original).

The same is true here. There are many instances where a manufacturer's compliance with H.B. 4005 would not result in any taking. First, not all the provided data elements that H.B. 4005 requires will be trade secrets at all, much less in every application. For example, the data elements asking for information such as whether there were changes in the published WAC price in the preceding year, which is published and available to the public, the length of time the drug has been on the market, names of generics, and opportunities for consumers to seek assistance, are obviously not trade secrets. And, even for data elements that might plausibly have been trade secrets if the company had kept them secret, DCBS's review has revealed that many of the reports simply recycle material previously disclosed in press releases and SEC filings. Soucy Decl. ¶ 7. Second, even assuming that trade secrets are provided to DCBS, PhRMA has not established that, on its face, H.B. 4005 will require *every* trade secret to be disclosed to the public.

In addition, not every disclosure of a trade secret is a taking. In *Ruckelshaus v. Monsanto*, 467 U.S. 986, n. 15 (1984), the Supreme Court explained that "the value of a trade secret lies in the competitive advantage it gives its owner over competitors." Thus, the Court explained, "it is the fact that operation of the data-consideration or data-disclosure provisions will allow a competitor to register more easily its product or to use the disclosed data to improve its own technology that may constitute a taking." *Id*. The Court cautioned, however, that disclosures of trade secrets that resulted in an economic loss from something other than "the destruction of an edge the submitter had over its competitors" would not constitute a taking. For example, the Court explained, if "a public disclosure of data reveals . . . the harmful side effects of the submitter's product and causes the submitter to suffer a decline in the potential profits

Page 17 -    DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO
                PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
                SW2/sm5/10252104-v2

from the sales of the product, that decline in profits stems from a decrease in the value of the pesticide to consumers, rather than the destruction of an edge the submitter had over its competitors, *and cannot constitute the taking of a trade secret*." *Id*.  (emphasis added).

PhRMA has not proven that the disclosure of trade secrets, if any, will necessarily result in "the destruction of an edge the submitter had over its competitors." *See id.*  The disclosures may simply reveal pricing practices that modify consumers' understanding of the value of the product, and cause them to look elsewhere for pharmaceutical products.  Under *Ruckelshaus*, such disclosures would not constitute a taking.

Moreover, PhRMA itself implicitly recognizes its failure to prove that H.B. 4005 will result in disclosure of trade secrets in all possible applications.  *See* ECF No. 25 at 14 ("*Each time* [DCBS] invokes the public-interest exception . . . it  . . . destroys the trade secret's *entire* value, working an unconstitutional taking of property for which Oregon offers no compensation.") (first emphasis added; second emphasis in original); ECF No. 25 at 18 ("HB 4005 Violates the Takings Clause *Every Time* It Requires Disclosure of a Manufacturer's Trade Secrets." (emphasis added); Compl. ¶ 81 ("In the *event* that [DCBS] unilaterally deems the disclosed information as being in 'the public interest,' Oregon's laws strip trade-secret protection . . . .") (emphasis added).  PhRMA's allegations and arguments necessarily acknowledge that H.B. 4005 will not require disclosure of a manufacturer's trade secrets in *every instance*, as required to meet its burden for a facial challenge.

Finally, states are *permitted to take private property* so long as it is for a public purpose; they only have to provide just compensation, which is generally decided on an as-applied basis. *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc*., 452 U.S. 264, 294-95 (1981) (facial takings claim failed where plaintiff fails to identify any property which has been actually been taken, and cautioning that courts should avoid deciding the constitutionality of statutes except in an actual factual setting particularly "in cases raising allegations of an unconstitutional taking of private property." (citing cases)); *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 686 (9th Cir. 1993) (an as-applied challenge involves "a claim that the particular impact of a government

action on a specific piece of property requires the payment of just compensation." (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494 (1987)).  Here, PhRMA fails to establish that any taking of trade secrets that *might* occur would *not* be for a public purpose.  Indeed, the converse is necessarily true.  Pursuant to the express terms of the H.B. 4005, DCBS can *only* publish trade secrets of PhRMA members if the *public interest* required disclosure—in other words, any taking would *on its face* be for a public purpose.  *See* H.B. 4005, sec. 2(10).  H.B. 4005, therefore, cannot be found to facially violate the Takings Clause.  If a drug manufacturer's trade secrets are "taken" because the public interest required it, PhRMA members would have recourse to seek just compensation on an as-applied basis.

### C.    PhRMA's First Amendment claim should be rejected because H.B. 4005 requires only commercial speech and passes the *Zauderer* test.

PhRMA fails to establish a facial free speech violation under the First Amendment.  The alleged violation is one of compelled speech.  According to PhRMA, H.B. 4005 (1) forces manufacturers, and not others in the prescription drug supply chain, to disclose pricing information, Compl. ¶¶ 60, 64-65, and (2) compels manufacturers to implicitly endorse the State's alleged message that they alone are responsible for increases in prescription drug prices. Compl. ¶¶ 59, 66.  These claims cannot survive judicial review because H.B. 4005's compelled disclosures are a permissible regulation of commercial speech that are rationally related to the State's substantial interest in prescription drug pricing.

### 1.    H.B. 4005 calls for commercial, not private, speech.

PhRMA fails to address that the required disclosures under H.B. 4005 are "commercial speech," and thus subject to a less stringent standard than PhRMA suggests.  While both commercial and non-commercial speech are protected under the First Amendment, "[t]he Constitution… accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 563 (1980) (internal citation omitted).  Courts have sometimes struggled to define what

Page 19 -  DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

precisely falls into the commercial speech category. *Masonry Building Owners of Oregon v. Wheeler*, 394 F.Supp. 3d 1279, 1298 (D. Or. 2019) ("Whether any particular expression is 'commercial speech' is a fact-driven analysis due to the difficulty of drawing bright lines."). One definition is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson,* 447 U.S. at 561. Commercial speech is also sometimes more narrowly described as "speech proposing a commercial transaction." *See e.g. Hunt v. City of Los Angeles*, 638 F.3d 703, 716 (9th Cir. 2011) (holding that plaintiffs who sold merchandise along Venice Boardwalk were "clearly propos[ing] a commercial transaction.").

For speech outside of this core, courts, as a general benchmark, often look to the factors outlined in *Bolger v. Youngs Drug Products Corporation—(*1) whether speech is presented in an advertising format; (2) whether the speech references a specific product; and (3) whether the speech has an economic motivation. 463 U.S. 60, 66-68 (1983). A combination of the factors provides strong support that particular speech is commercial but all three factors need not be present to reach that conclusion. *Id.* In a case similar to the current controversy about prescription drug-related disclosures, the court in *Rowe* held that the compelled disclosures in that case - information concerning the discounts and other contract terms that pharmacy benefit managers ("PBMs") were able to negotiate with drug manufactures and pharmacies – *were* commercial speech because the information was "overtly geared at the economic interests of PBMs and the covered entities." 429 F.3d at 309. Furthermore, "[e]ven those provisions…that are on their face less related to 'economic interests'—e.g. . . . requiring PBMs to disclose conflicts of interest—are aimed at eliminating certain PBM practices that unnecessarily increase the cost of prescription medications." *Id*. at 309-10. *Cf. Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 959 (9th Cir. 2012) (finding that the Yellow Pages directory was not commercial speech because "[t]here [was] certainly no clear link between because "[t]here [was] certainly no clear link between [its] noncommercial speech (community information and phone listings) and [its] commercial speech (a wide array of advertisements")).

Under the *Bolger* factors, the information manufacturers are required to disclose under H.B. 4005 is "commercial speech." The disclosures identify a specific product, namely the manufacturers' (1) existing prescription drugs whose WAC price was $100 or more for a one-month supply or for a course of treatment lasting less than one month and whose price had at least a net 10 percent increase over the previous year, or (2) new prescription drugs set at a price exceeding the threshold established by the Centers for Medicare and Medicaid Services for specialty drugs in the Medicare Part D program. Additionally, with their focus on prescription drug prices and their related increases, the required disclosures propose a commercial transaction with a "discernable relationship to [the] products…offered by Plaintiff[]." *Masonry,* 394 F.Supp.3d at 1298.

For these reasons, this Court should reject PhRMA's argument that heightened scrutiny applies to H.B. 4005. PhRMA fails to adequately acknowledge that not all "compelled speech" is treated the same under the courts' First Amendment jurisprudence. As the Supreme Court succinctly noted, routine disclosure requirements are "simply not the same as forcing a student to pledge allegiance [] or forcing a Jehovah's Witness to display the motto 'Live Free or Die.'" *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006). That is particularly true where, as here, the disclosures pertain to commercial activity – which is subject to lesser protection under the first amendment. *See e.g. Ass'n. of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726, 731 (9th Cir. 1994).

While the courts generally apply the *Central Hudson* test [8] in instances of *restrictions* on commercial speech, recent Ninth Circuit caselaw establishes that the *Central Hudson* "intermediate scrutiny test does not apply to *compelled*, as distinct from restricted or prohibited, commercial speech." *CTIA- The Wireless Assoc. v. City of Berkeley, California*, 928 F.3d 832,

---

[8] "Under *Central Hudson*, the government may restrict or prohibit commercial speech that is neither misleading nor connected to unlawful activity, as long as the governmental interest in regulating the speech is substantial. . . . The restriction or prohibition must 'directly advance the governmental interest asserted,' and must not be 'more extensive than is necessary to serve that interest.'" *CTIA*, 928 F.3d at 842 (citations omitted).

842 (9th Cir. 2019) (*citing Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 631(1985)) (emphasis added).  This is because "[m]andated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests." *CTIA*, 928 F.3d at 843 (quoting *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001).

Instead, the appropriate test for compelled commercial-speech disclosures, like the ones at issue here, is the lower-scrutiny *Zauderer* test.  "Under *Zauderer* . . . the government may compel truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably related' to a substantial governmental interest, . . . and involves 'purely factual and uncontroversial information' that relates to the service or product provided." *CTIA,* 928 F.3d at 842 (citations omitted).  Under *Zauderer*, the court examines whether the compelled speech is: (1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome.  A restriction must satisfy all three to be constitutional. *Am. Beverage Ass'n v. City & Cty. of S.F.*, 916 F.3d 749, 756 (9th Cir. 2019).  As explained below, H.B. 4005 satisfies all three of these requirements.

PhRMA's argument otherwise is contrary to existing law and is undermined by the authorities it cites.  First, the speech at issue in *Frudden v. Pilling*, a school policy that mandated a written logo on school uniforms, was plainly non-commercial speech. 742 F.3d 1199, 1204 (9th Cir. 2014)..  Additionally, the only two cases PhRMA cites that address disclosure requirements in a commercial context did in fact assess speech using the *Zauderer* analysis. *See Am. Beverage,* 916 F.3d at 756 (applying the *Zauderer* analysis and ultimately holding that the requirement of a warning label that covered 20% of a beverage container was unduly burdensome); *Nat'l Institute of Family & Life Advocates v. Becerra* (NIFLA),—— U.S. ——,  138 S.Ct. 2361, 2372 (2018) (applying the *Zauderer* analysis to hold that the disclosure at issue did not relate to the services the clinics provided and concerned abortion, a clearly controversial topic).

As explained below, H.B. 4005 satisfies all three elements and so the rational basis review pursuant to *Zauderer* applies here.

Page 22 -   DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO
        PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
          SW2/sm5/10252104-v2

   2.      **H.B. survives constitutional review under the three-pronged *Zauderer* test for commercial speech.**

   a.      **H.B. 4005 is rationally related to a substantial state interest.**

H.B. 4005 is "reasonably related to a substantial governmental interest." *CTIA*, 928 F.3d at 845. Under *Zauderer* itself, the substantial government interest at issue was preventing deceptive advertising. 471 U.S. at 644-45. However, the Ninth and other circuits have held that other substantial interests, including "furthering public health and safety," are also sufficient under *Zauderer* test. *CTIA,* 928 F.3d at 844 (listing cases from sister circuits so holding). The Ninth Circuit has described the requisite "substantial interest" as one that is "more than trivial" and explained that "the interest at stake must be more than the satisfaction of mere "consumer curiosity" and "[d]isclosures must remedy a harm that is 'potentially real not purely hypothetical[.]" *Id.* The Court, however, made clear that "[i]n so holding [that public health and safety is sufficient under *Zauderer*], we do not foreclose that other substantial interests in other cases may suffice as well." *Id.* Courts will "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [the courts] to conclude that they could not have been a goal of the legislation." *Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*, 903 F.3d 903, 912 (9th Cir. 2018) (internal citations omitted).

The stated objectives of H.B. 4005—to provide accountability for prescription drug pricing to permit purchasers, both public and private, as well as pharmacy benefit managers, to negotiate discounts and rebates for prescription drugs consistent with existing state and federal law— further a substantial state interest. *See* H.B. 4005, preamble; Morgan Decl., Ex. 2, p. 14.

For example, the court in *Rowe*, stated that "[w]e think it obvious that the…disclosure requirements are 'reasonably related' to [the State's] interest in…increasing public access to prescription drugs." 429 F.3d at 310. The same is true for H.B. 4005. The Vice-Chair of the House Committee on Health Care noted: "with these transparency measures in place, consumers can educate themselves about why their medications cost so much, and perhaps, we, as legislators, can begin to hold manufacturers accountable, and better understand what is

Page 23 -   DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO
            PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
            SW2/sm5/10252104-v2

happening, and allow this information to inform regulations that we might contemplate down the road." Morgan Decl., Ex. 1, pp. 4-5. Self-reported information from drug manufacturers about the various factors that contribute to rising drug prices is rationally-related to the increased transparency goals of H.B. 4005. This transparency can then be expected to enhance information available in the market and allow markets to function more efficiently, which would benefit consumers, including the state, which itself is a large purchaser of prescription drugs. PhRMA appears to suggest that the State's interest may only be valid if it regulates every member of the drug supply chain.[9] *See* ECF No. 25 at 37 ("…if the State were truly interested in accountability…it would not have requested information only from manufacturers"; "[i]f genuinely committed to educating the public…the State would have requested *other* supply-chain participants…to provide information…") (emphasis in original). While this law will not, of course, solve all of the unaffordability problems in the pharmaceutical drug products marketplace, laws are not required to solve every part of every problem to be valid. Incremental improvement in the marketplace through increased information about pricing on behalf of consumers is a valid state interest.

PhRMA suggests that the "only possible way the compelled statements could curb drug prices would be through public shaming," ECF No. 25 at 36 citing to *Nat'l Ass'n of Mfrs v. SEC*, 800 F. 3d 518 (D.C. Cir. 2015)). There, the SEC required firms disclose whether or not they used "conflict minerals"—minerals from the Congo used to finance "war and humanitarian catastrophe." *Id.* at 545. The court found the disclosure akin to compelling the firms "to confess

---

[9]H.B. 4005 does in fact address this very concern with the creation of the Task Force of Fair Pricing of Prescription Drug which brings together legislative and industry representatives to "create transparency for drug prices across the entire supply chain of pharmaceutical products, including but not limited to manufacturers, insurers, pharmacy benefit managers, distributors, wholesalers and retail pharmacies." H.B. 4005, sec. 11(3) Defendant has been appointed to the Task Force by the Governor of the State of Oregon to represent the interests of pharmaceutical manufacturers. *See Joint Task Force on the Fair Price of Prescription Drugs, Report on Transparency Strategies for the Pharmaceutical Supply Chain, Pursuant to House Bill 4005 (2018)* https://olis.oregonlegislature.gov/liz/2017I1/Downloads/CommitteeMeetingDocument/152412 (last visited May 24, 2020).

blood on [their] hands". *Id.* at 530.  That kind of prejudicial disclosure is a far cry from the factual information required under H.B. 4005, which in no way "conveys moral responsibility" on drug manufacturers. *Id.*

Finally, PhRMA's framing of the State's interest as simply a "general interest in educating *itself*," ECF No. 25 at 37, about drug prices mischaracterizes that interest, ignoring the larger public interest health goals of H.B. 4005.  Furthermore, the suggestion that education would need to be a "pressing public necessity" quotes the *dissenting* portion of an opinion concurring in part and dissenting in part and which was specifically directed not at disclosures as in the present case but at "speech *restrictions*." *Turner Broadcasting System, Inc. v. F.C.C.*512 U.S., 622, 680 (1994)(emphasis added).

> **b.      H.B. 4005 requires disclosure only of factual and uncontroversial information.**

PhRMA's contention that H.B. 4005 is a content-based restriction meant to promote "a particular viewpoint," ECF No. 25 at 35, should be rejected.  As the Ninth Circuit has explained, the factual and uncontroversial requirement is satisfied where, as here, the disclosure requirements do not "attempt[] to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.'" *Envtl. Defense Ctr., Inc., v. U.S. E.P.A.*, 344 F.3d 832, 849 (9th Cir. 2003). The *Zauderer* standard applies where, as here, the compelled disclosure involves "purely factual and uncontroversial" information.  *CTIA*, 928 F.3d at 845.  It does not apply to compelled false or misleading statements made by the speaker. *NIFLA*,—— U.S. ——, 138 S. Ct. at 2371 (religious health clinics could not be compelled to make statements about the availability of abortions from other providers).

Much of the information required for disclosure under H.B. 4005 is simply numbers or bare facts, including the name and price of the prescription drug; the net increase in the price of the drug; the length of time the prescription drug has been on the market; the research and development costs associated with the prescription drug that were paid using public funds; costs

for manufacturing, marketing, distributing, and ongoing safety monitoring; sales revenue;  the manufacturer's profit during the previous year; the drug's introductory price and published price increases over time, pricing in other countries, and the date of and the price paid for acquisition of the new prescription drug by the manufacturer. *See* H.B. 4005, sec. 2(2)

Other reportable data elements might arguably call for more of a narrative, but can still be answered in a way that is purely factual and uncontroversial, such as a description of the marketing used in the introduction of the new prescription drug, the factors that contributed to the price increase, and the methodology used to establish the price of the new prescription drug. *See id.*, sec. 2(6).  While there may be instances where the answer to these questions might be something other than purely factual (and may allow more "spin" or narrative), PhRMA has not carried its burden, in this facial challenge, to show that this is always, or even often, the case.

PhRMA's claim that H.B. 4005 somehow "advance[s] the view…that manufacturers alone are responsible for the high price of prescription drugs", ECF No. 25 at 35, has already been rejected by the courts.  The mortgage refinancing company in *National Biweekly Administration v. Owen* similarly argued that to disclose that its solicitations were not authorized by the lender was not purely factual because it misleadingly suggested that the lender had some authority to permit the solicitation or not. 873 F.3d 716, 733 (9th Cir. 2017).  In rejecting that argument, the court explained that "[t]he mere fact that a corporation can conjure up a possibly negative connotation …in a disclosure does not make the disclosure nonfactual." *Id*. Furthermore, in *CTIA*, the Ninth Circuit concluded that, if a retailer was concerned that required disclosures were "inflammatory and misleading," it could add to the disclosure as it saw fit. 928 F.3d at 848.  Here too, H.B. 4005 allows manufacturers of existing drugs to include "[a]ny other information that [they] deem[] relevant to the [WAC] increase", which many have in fact already done. H.B. 4005, sec. 2(2)(k); *see* Soucy Decl. ¶ 13.  Furthermore, PhRMA offers nothing but its conclusory assessment that H.B. 4005's disclosure requirements "attribut[e] sole responsibility," ECF No. 25 at 35, to manufacturers for drug price increases, in the eyes of consumers and the general public.  The court in *CTIA* noted that the plaintiff had not "presented any

Page 26 -    DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
SW2/sm5/10252104-v2

evidence…showing how Berkeley consumers have understood the compelled disclosure, or evidence showing that sales of cell phones in Berkeley were, or are likely to be, depressed as a result of the compelled disclosure." 928 F.3d at 848.  Neither has PhRMA presented any evidence in the present case to suggest that the viewing public could or would misinterpret the otherwise factual information included in the disclosure reports as an allocation of blame. Consequently, H.B. 4005 compels disclosure of purely factual and uncontroversial information as allowed under *Zauderer*.

**c.**    **H.B. 4005 is not unduly burdensome.**

To satisfy *Zauderer*, the compelled disclosure cannot be "unduly burdensome." 471 U.S. at 651.  A disclosure is unduly burdensome if it effectively "drown[s] out" the speaker's own message. *Am. Beverage*, 916 F.3d at 761.  Here, nothing about the H.B. 4005 "drowns out" manufacturers' own messaging.  First, H.B. 4005 requires reporting of historical information for existing prescription drugs and some current information for new prescription drugs.  Second, manufacturers already prepare and disclose much of the information required under H.B. 4005 in other public settings. Soucy Decl. ¶¶ 7-8.  Finally, manufacturers remain free to expand on H.B.'s factual disclosure requirements by, for example, denying that they have anything to do with the rising costs of a particular prescription drug or to argue that blame should be shifted to others.

Consequently, this Court should find that H.B. 4005 is constitutional under the *Zauderer* test and grant summary judgment for DCBS.

**D.**    **PhRMA's dormant Commerce Clause challenge fails as a matter of law because H.B. 4005 does not regulate any interstate commerce.**

PhRMA contends that H.B. 4005 per se violates the dormant Commerce Clause because it requires disclosure of information relating to certain historical pricing increases, which, in turn, *could* discourage increases in prescription drug prices indefinitely.  Compl. ¶¶ 5, 54-55; ECF No. 25 at 39-49.  PhRMA argues that H.B. 4005 "control[s] commerce nationwide . . . by tying

Page 27 -    DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO
          PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
              SW2/sm5/10252104-v2

onerous reporting requirements to increases in the drug's 'wholesale acquisition cost' [WAC]," a term defined by federal law.  ECF No. 25 at 30.

As explained below, PhRMA significantly overstates the reach of the dormant Commerce Clause.  PhRMA's speculative and conclusory allegations do not amount to a per se Commerce Clause violation.  H.B. 4005 merely requires reporting of certain information; it does not regulate or discriminate against any extra-territorial commerce.  To the extent that it may discourage certain price increases or initial prices for new drugs because they would trigger reporting and potential disclosure of information relating to the WAC, that is constitutionally permitted.  Summary judgment should therefore be granted against the Commerce Clause challenge to H.B. 4005.

### 1.    The scope of the Dormant Commerce Clause is narrow.

To determine whether a state statute violates the dormant Commerce Clause, courts take a two-tiered approach.  *Brown-Forman Distillers Corp. v. N. Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *Pharma Research & Mfrs. of Am. v. Cty. of Alameda*, 768 F.3d 1037, 1039 (9th Cir. 2014).  First, "[w]hen a state statute directly regulates or discriminates against interstate commerce" . . . the statute is generally struck down "without further inquiry."  *Brown-Forman*, 476 U.S. at 579. But when a statute does not discriminate against interstate commerce but "regulates even-handedly" and only incidentally affects interstate commerce, the court conducts the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  Under this balancing test, courts look to "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits."  *Brown-Forman*, 476 U.S. at 579.[10]

The dormant Commerce Clause is primarily concerned with state economic protectionism designed to benefit in-state economic interests by burdening out-of-state competitors.  *Pharma Research & Mfrs. of Am.*, 768 F.3d at 1041 (citing *Dep't of Revenue of Ky. v. Davis*, 553 U.S.

---

[10] PhRMA does not allege or argue that the H.B. 4005 fails the *Pike* balancing test and so DCBS does not analyze that theory in this brief, presumably because PhRMA cannot meet its burden of proving a Commerce Clause violation under that test.

328, 337-338 (2008)).  H.B. 4005 does not touch on that concern in any way—it does not discriminate against interstate commerce or constitute economic protectionism.

Three United States Supreme Court decisions illustrate the dormant Commerce Clause doctrine based on direct regulation of interstate commerce, which is PhRMA's *only* theory of liability for its commerce clause claim.  *See Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935) (striking down a New York law that prohibited out-of-state companies from selling milk in the state unless they purchased their milk from dairy farmers at the same price paid to New York dairy farmers), *Brown-Forman*, 476 U.S. 573 (1986) (striking down a provision of the New York Alcoholic Beverage Control Law that required liquor distillers or producers selling to wholesalers within the state to affirm that their prices for products sold to in-state wholesalers were no higher than the lowest price at which the same product was sold in any other state during the current month), and *Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989) (striking down the Connecticut Liquor Control Act, which required out-of-state beer shippers to affirm that the prices of their products sold to Connecticut wholesalers were no higher than the prices of those same products sold in bordering states).  PhRMA does not (nor could it plausibly) argue that the H.B. 4005 is like any of the laws struck down in these cases.

PhRMA also ignores that the Supreme Court has limited the extraterritoriality principle enunciated in *Baldwin*, *Brown-Foreman*, and *Healy* to price-control or price-affirmation statutes which link prices paid in-state with those that are paid out-of-state.  In *Pharmaceutical Research & Manufacturers of America v. Walsh,* nonresident drug manufacturers challenged a Maine statute that required certain manufacturers selling drugs in Maine to enter into a rebate agreement with the Maine State Commissioner, or else meet a set of prior authorization requirements to dispense drugs in the state, that reduced a company's sales and market share in Maine.  538 U.S. 644, 653-654, 655-656 (2003).

The *Walsh* plaintiff argued that "with the exception of sales to two resident distributors, all of their prescription drug sales occur outside of Maine," so the act must be an impermissible extraterritorial regulation.  *Id*. at 656.  The United States Supreme Court disagreed, explaining

that the rule articulated in *Baldwin* and *Healy* "is not applicable to this case" because the Maine Act is not a price-control or price-affirmation statute either by its express terms or by its inevitable effect, does not regulate prices of any out-of-state transaction, and does not tie in-state prices to out-of-state ones. *Id*. at 669. *See Ass'n des Eleveurs de Canards*, 729 F.3d 937, 951 (9th Cir. 2013) ("*Healy* and *Baldwin* involved 'price control or price affirmation statutes'" and are inapplicable to a statute "that does not dictate the price of a product and does not 't[ie] the price of its in-state products to out-of-state prices'"); *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1175 (10th Cir. 2015) (extending *Baldwin* doctrine to become a "weapon far more powerful than" established dormant Commerce Clause jurisprudence would be "novel lawmaking project").

### 2.    H.B. 4005 does not regulate or discriminate against any interstate commerce.

H.B. 4005 does not set or prohibit any prices or tie in-state Oregon prices to out-of-state prices as in *Baldwin*, *Brown-Foreman*, and *Healy*. Drug manufacturers remain as free after its enactment as before, to sell their drugs at whatever price they choose, and to change prices as often as they see fit. That drug purchasers, including the State of Oregon itself, will be armed with information regarding past price increases in order to make purchasing decisions, is allowed by the dormant Commerce Clause. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1149-1151 (9th Cir. 2012) (state law adjusting structure or method of operation in retail market not protected by Commerce Clause).

Moreover, a state statute is not extraterritorial in effect because it may affect business decisions made out-of-state or have out-of-state consequences simply by indirectly *discouraging* price increases nationally. In *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013), the court rejected an extraterritoriality challenge to California's Low Carbon Fuel Standard, which limited the average carbon-intensity of fuel sold for use within the state. *Id*. at 1101-1106. The court recognized that California's standard might lead some fuel producers, including some out-of-state producers, to make different business decisions in order to obtain

price premiums or increase their competitiveness in California's market. *Id*. at 1101.  The court found these indirect effects permissible because California's standard, unlike the law in *Healy*, controlled only its *own* market. *Id*. at 1102-1103 (emphasis added).

Similarly, in *Walsh*, the plaintiff submitted affidavits on actual and potential out-of-state impacts of a new state law requiring manufacturers selling drugs in Maine to enter into a rebate agreement, including the law's effect on pricing decisions. 538 U.S. at 656-657. *Walsh* held that the Maine law did not impermissibly dictate the terms of any out-of-state transaction either directly or by "its inevitable effect." *Id*. at 669.

PhRMA relies heavily on the Ninth Circuit's decision in *National Collegiate Athletic Ass'n v. Miller (NCAA)*, 10 F.3d 633, 638-39 (9th Cir. 1993), for the proposition that the H.B. 4005 must be struck down.  ECF No. 25 at 30-31.  *NCAA* is inapposite.  PhRMA's analogy to the Nevada law under challenge in *NCAA* is that "[l]ike the NCAA's internal rules, the WAC is set under a single standard that applies 'even-handedly and uniformly on a national basis'" and H.B. 4005 somehow interferes with that uniform standard.  ECF No. 25 at 31.  This argument fails for several reasons.  First, the WAC is nothing like NCAA rules.  The WAC is simply a federally defined term; PhRMA has not alleged or established anything beyond that simple fact.  PhRMA has not shown that drug companies are required to use the WAC or that it is enforceable or that it is part of any national governing association or body.  Moreover, nothing in H.B. 4005 interferes with how the WAC is defined or used.

Ninth Circuit cases decided after *NCAA* confirm that there is no Commerce Clause problem with H.B. 4005.  PhRMA's claim that drug list prices are inherently "national" in character is not sufficient to establish a commerce clause violation.  *See, e.g., Ass'n des Eleveurs de Canards*, 729 F.3d at 952; *see also Rocky Mt. Farmers Union*, 730 F.3d at 1104-1105; *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978) (declining to accept Exxons "novel suggestion" "that because the economic market for petroleum products is nationwide, no State has the power to regulate the retail marketing of gas").PhRMA's claim that H.B. 4005 per se violates the Commerce Clause should be rejected on summary judgment.

Page 31 -    DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO
           PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
              SW2/sm5/10252104-v2

### 3.     The market participant doctrine exempts H.B. 4005 from the Dormant Commerce Clause.

The market participant doctrine provides an independent basis to grant summary judgment against PhRMA's Commerce Clause claim. That doctrine distinguishes between a state's role as regulator of a market and its role as a market participant. *Eng. Mfrs. Ass'n v. S. Coast Air Quality Mgt. Dist.*, 498 F.3d 1031, 1040 (9th Cir. 2017). In determining whether the market participant exception applies to an alleged violation of the Commerce Clause, "courts undertake 'a single inquiry: whether the challenged program constituted direct state participation in the market.'" *Id*. Here, the Oregon legislature has made clear that H.B. 4005's disclosure requirements further the State's interest as a *purchaser* of prescription drugs. *See, e.g.,* Preamble to H.B. 4005 ("Whereas the state is a major purchaser of prescription drugs through the Public Employees' Benefit Board, the Oregon Health Authority, the Department of Human Services and the Department of Corrections"; and "Whereas the Legislative Assembly intends by this 2018 Act to permit purchasers, both *public* and private, as well as pharmacy benefit managers, to negotiate discounts and rebates for prescription drugs consistent with existing state and federal law[.]") (emphasis added). The market participant doctrine thus provides an additional ground for rejecting PhRMA's dormant Commerce Clause challenge to H.B. 4005.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Page 32 -    DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
SW2/sm5/10252104-v2

## VI.    CONCLUSION

For the reasons set forth above, DCBS respectfully asks this Court to reject PhRMA's challenges to H.B. 4005.  DCBS's motion for partial summary judgment should be granted and PhRMA's cross-motion for partial summary judgment should be denied.

DATED May   26   , 2020.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General

_s/ Carla A. Scott_
SHAUNEE MORGAN No. 194256
CARLA A. SCOTT No. 054725
Senior Assistant Attorneys General
Trial Attorneys
Shaunee.Morgan@doj.state.or.us
Carla.A.Scott@doj.state.or.us
Of Attorneys for Defendant